## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

BACARDI & COMPANY LIMITED and BACARDI
U.S.A. INC.,

                  Plaintiffs,

          v.

UNITED STATES PATENT AND TRADEMARK
OFFICE, and DREW HIRSHFELD, in his official
capacity as the acting Director of the United States Patent
and Trademark Office,

                  Defendants.

Civil Action No.:  1:21-cv-1441

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Bacardi & Company Limited ("BACO") and Bacardi U.S.A. Inc. ("BUSA")
(collectively, "Bacardi"), by and through their attorneys Kelley Drye & Warren LLP and
Covington & Burling LLP, as and for their complaint against the United States Patent and
Trademark Office ("PTO"), alleges as follows:

### NATURE OF THE ACTION

1.     Bacardi brings this action to set aside the unlawful and arbitrary actions of the
PTO which purported to renew the HAVANA CLUB trademark registration held by Empresa
Cubana Exportadora de Alimentos y Productos Varios d/b/a Cubaexport ("Cubaexport") ten
years after the registration had expired by operation of the Lanham Act and was declared
"cancelled/expired," because Cubaexport had failed to pay the required filing fee within the time
period required by statute.

2.     Cubaexport was not permitted to pay the filing fee to renew its registration in

2006, as the statute required it to do in order to avoid expiration, because the mark was associated with a Cuban rum business that was forcibly confiscated from its original owner, Jose Arechabala S.A. ("JASA"), predecessor in interest to Bacardi, by armed special forces of the Castro regime in 1960 without compensation.

3.    The Cuban government unlawfully gave Cubaexport possession of all of JASA's assets – the rum distillery, factories, bank accounts, books, and records.  JASA's owners and employees either had to work under the management of a Castro loyalist or they were jailed or forced into exile.

4.    With JASA's owners scattered across the globe and the company lacking any capability to manufacture or sell its prestigious rum, Cubaexport began to register the HAVANA CLUB mark in countries around the world, including the United States.

5.    Cubaexport, and its business partner Pernod Ricard, have since trafficked in the stolen property of JASA by manufacturing and selling a bootleg HAVANA CLUB branded rum all around the world.  But the United States embargo and other Congressional action has prevented the Cuban regime from profiting off of JASA's stolen property in this country.

6.    Indeed, Cubaexport has never sold a single bottle of its ersatz rum bearing the HAVANA CLUB mark in the United States since it fraudulently obtained registration of the mark in 1976 because of the Cuban embargo.  That embargo will remain in place absent Congressional action.

7.    Congress has also prohibited United States courts from recognizing or enforcing any rights Cubaexport may claim in the stolen HAVANA CLUB mark in the United States, whether arising from common law, statute, or treaty.

8.    Against that backdrop, in 2006, Cubaexport applied for a specific license from the

Office of Foreign Assets Control ("OFAC") in an attempt to pay the mandatory fee to renew its registration of the HAVANA CLUB trademark.  OFAC denied the application on the grounds that it was contrary to U.S. foreign policy.

9.      As a result of OFAC's refusal to grant a specific license in 2006, Cubaexport was not able to fulfill the statutory requirements to renew its registration of the confiscated HAVANA CLUB mark.

10.     The PTO, in an Office Action, gave Cubaexport six months to correct the deficiency, at which point the registration would automatically expire by operation of the statute. Cubaexport was unable to pay the filing fee within the six-month deadline.  Thus, in August 2006, the PTO determined that "the registration will be cancelled/expired." Exhibit 1.

11.     Cubaexport petitioned the Director to reverse that determination.  That petition remained open for over ten years.

12.     On January 11, 2016, OFAC issued Cubaexport a specific license purporting to authorize Cubaexport to "engage in all transactions necessary to renew and maintain the HAVANA CLUB trademark registration No. 1,031,651."

13.     Only three days later, the PTO suddenly acted on Cubaexport's ten-year-old petition in a brief decision by the Commissioner for Trademarks acting under delegated authority from the Director.

14.     The PTO granted the petition and purported to authorize renewal of Cubaexport's long-dead HAVANA CLUB registration on the grounds that it had somehow retroactively paid the filing fee.

15.     The PTO exceeded and/or abused its authority by purporting to resurrect the dead HAVANA CLUB registration nearly ten years after it correctly determined that "the registration

will be cancelled/expired" because of Cubaexport's failure to timely fulfill the mandatory renewal requirements.  The PTO also lacked statutory authority to permit correction of deficiencies in Cubaexport's December 2005 renewal application (i.e. the failure to pay the fee) beyond the six-month deadline provided in the July 2006 Office Action.

16.     The PTO's action seriously prejudices Bacardi.  In the 1990s, Bacardi acquired all of JASA's rights in the HAVANA CLUB trademark and began selling HAVANA CLUB rum in the United States, which sales continue today.  Bacardi also submitted an application to the PTO for the HAVANA CLUB mark, which application remains pending and, if Cubaexport's registration is permitted to stand, is likely to be rejected in light of Cubaexport's registration of the same mark.  Bacardi is also prejudiced because its sales of the real HAVANA CLUB rum throughout the United States are being made while Cubaexport supposedly owns the trademark's registration in the PTO.

17.     PTO's action granting Cubaexport's petition and permitting Cubaexport's renewal of its HAVANA CLUB registration some ten years after the registration had expired is a moral outrage to be sure, but also violates the law and must be set aside.

## JURISDICTION AND VENUE

18.     This action arises under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and under the Court's inherent authority to review *ultra vires* administrative actions, *Leedom v. Kyne*, 358 U.S. 184, 188 (1958).

19.     This Court has jurisdiction and is authorized to issue the relief sought under 28 U.S.C. sections 1331, 1338, 2201-2202, and 5 U.S.C. sections 702, 706.

20.     Venue is proper in this district under 28 U.S.C. section 1391(e) because Defendant PTO is located in this district, and because a substantial part of the events giving rise

to the claim occurred in this district.

## THE PARTIES

21.     Plaintiff Bacardi & Company, Ltd. is a Liechtenstein company having its principal place of business at 267 route de Meyrin, 1217 Meyrin, Switzerland.  Bacardi & Company, Ltd. is the successor to Compañía Ron Bacardí, S.A., a Cuban *sociedad anónima* (joint-stock company) which was headquartered in Santiago de Cuba, Republic of Cuba, until its assets in Cuba were confiscated by the Cuban government in October 1960.  Through its affiliates, licensees, and distributors, Bacardi & Company, Ltd. produces and markets distilled spirits worldwide.

22.     Plaintiff Bacardi U.S.A., Inc. is a United States company having its principal place of business at 2701 Le Jeune Road, Coral Gables, Florida, 33134.  Bacardi U.S.A., Inc. is affiliated with Bacardi & Company, Ltd. and imports, markets, distributes, and sells distilled spirits in the United States.

23.     Bacardi & Company, Ltd. is the owner of Application Serial No. 74/572,667 pending in the PTO for registration of the mark HAVANA CLUB for rum (the "Bacardi Application"), which was filed on September 12, 1994.  Bacardi U.S.A., Inc. markets, distributes, and sells rum under the HAVANA CLUB trademark throughout the United States.

24.     The Bacardi Application is currently suspended pending resolution of a federal lawsuit in which Bacardi is seeking to have Cubaexport's trademark registration for HAVANA CLUB declared expired, and/or to cancel the registration on the grounds of, among other things, fraud on the PTO.  *Bacardi & Company Limited et. al. v. Empresa Cubana Exporiadora de Alimentos y Productos Varios et. al.*, Case No. 1:04-cv-00519-EGS (D.D.C).  Before the Bacardi Application was suspended, the PTO stated that it would be refused under section 2(d) of the

Trademark Act in part because of Cubaexport's existing registration. *See* Exhibit 2. Thus, Bacardi is prejudiced by the PTO's unlawful actions as described in this complaint.

25.     Defendant PTO is a federal agency in the Department of Commerce. The PTO is located at Madison Building, 600 Dulaney Street, Alexandria, Virginia 22314.

26.     Defendant Drew Hirshfeld is performing the functions and duties of the Director of the PTO and is being sued in his official capacity.

## LEGAL FRAMEWORK

### A.     U.S. Trademark Registration and Renewal Requirements

27.     The PTO is responsible, among other things, for the registration of trademarks.

28.     As relevant here, owners are required to file an acceptable affidavit or declaration of use or excusable nonuse, "accompanied by the fee prescribed by the Director" during the statutorily prescribed periods pursuant to section 8 of the Trademark Act, as amended, 15 U.S.C. § 1058 ("Lanham Act"), in order to maintain a federal registration.

29.     Pursuant to section 9 of the Lanham Act, 15 U.S.C. § 1059, renewal requires "payment of the prescribed fee" for each class of goods and services and the timely filing of a verified application signed by the registrant or the registrant's representative within the statutory deadline. 15 U.S.C. § 1059; 37 C.F.R. § 2.183.

30.     If the requirements of section 9 are not satisfied before the end of the renewal period, the federal trademark registration involved automatically "expires." 37 C.F.R. §§ 2.182-2.186.

31.     If the owner of a registration files a renewal application which is deficient in any way, the PTO will issue an office action advising of the deficiency and providing a period in which to cure the deficiency.

32.     Pursuant to 15 U.S.C. section 1059, "[i]f any application filed under this section is deficient, the deficiency may be corrected within the time prescribed after notification of the deficiency, upon payment of a surcharge prescribed therefor."

33.     Payment of the required fee is a "requirement[] for a complete renewal application." A renewal application filed without a fee or with an insufficient fee is deficient. *See* 15 U.S.C. § 1059; 37 C.F.R. § 2.183(b).

34.     If a renewal application is not acceptable, "the Office will issue a notice stating the reason(s) for refusal." 37 C.F.R. § 2.184(a). Any response to the refusal must be filed "within six months of the date of issuance of the Office action, or before the expiration date of the registration, whichever is later." *Id.* § 2.184(b)(1).

35.     Thus, the PTO's practice when refusing renewals is to state that "[a]ny deficiency must be cured within the set period for response to the Office action, i.e., within six months of the issuance date of the action, or before the expiration date of the registration, whichever is later." Trademark Manual of Examining Procedure ("TMEP") 1606.13(a). If a renewal application is filed during the grace period provided in section 9(a), then "[d]eficiencies must be cured within six months of the issuance date of the Office action." TMEP 1606.13(b).

**B.     PTO Record Keeping and Actions Regarding Renewal of Trademark Registrations**

36.     The Lanham Act requires the Director of the PTO to maintain a public record of all registered trademarks. 15 U.S.C. § 1057(a). When the status of a registration changes, the PTO is required to update its electronic records to indicate the status change.

37.     If the requirements of section 9 are not satisfied before the end of the renewal period, the registration automatically expires and the PTO is required to update its records to reflect that the registration is expired. *See* 37 C.F.R. § 2.182; TMEP § 1611.

38.     When the PTO updates the registration records to accurately reflect their legal

status, the PTO performs a ministerial, non-discretionary record-keeping function.

39.     A registration that has been renewed remains designated as "live" in the PTO's records, while a registration that has expired under section 9 and/or been cancelled under section 8 is designated as "dead."

40.     The Director has no discretion to waive the requirements of sections 8 and 9. Thus, if a section 8 registration or a section 9 renewal is not accompanied by the prescribed fees, and that deficiency is not cured within the time period prescribed in the notice of deficiency, the registration expires as a matter of law, and the Director has no discretion but to issue a refusal stating that the registration will be canceled and/or has expired.

## C.      The Cuban Asset Control Regulations

41.     In 1963, the United States imposed a total embargo of trade between the United States and Cuba under the Trading with the Enemy Act, 50 U.S.C. App. § 1 *et. seq.* The embargo has been implemented by the Cuban Asset Control Regulations ("CACR"), 31 C.F.R. Part 515, which are administered by OFAC.  In 1996, Congress enacted the Cuban Liberty and Democracy Solidarity Act (the "Libertad Act"), which, among other things, codified the Cuban embargo.  28 U.S.C. § 6032(h).

42.     The CACR prohibits all transactions involving property, including trademarks, in which Cuba, or any national thereof, has any interest of any nature whatsoever, direct or indirect, except as specifically authorized by OFAC.

43.     The CACR provides that "any person having an interest in a transaction or proposed transaction may file an application [with OFAC] for a [specific] license."  31 C.F.R. § 501.801(b)(2).

44.     Until 1998, section 515.527 of the CACR created a "general license" authorizing the registration and renewal in the PTO of trademarks in which the Government of Cuba or a

Cuban national has an interest.

45.     On October 21, 1998, Congress passed Section 211 of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, Public Law No. 105-277, 112 Stat. 2681 (Oct. 21, 1998) ("Section 211").

46.     Section 211 was designed to prevent the registration, renewal, or enforcement in the United States of trademarks associated with businesses that were confiscated by foreign governments (such as Cuba) and to recognize the property rights of victims of such confiscation and their successors-in-interest.

47.     Section 211(a)(1) provides, in part, that:

> Notwithstanding any other provision of law, no transaction or payment shall be authorized or approved pursuant to section 515.527 of title 31, Code of Federal Regulations, as in effect on September 9, 1998, with respect of a mark, trade name, or commercial name that is the same as or substantially similar to a mark, trade name, or commercial name that was used in connection with a business or assets that were confiscated unless the original owner of the mark, trade name, or commercial name, or the bona fide successor-in-interest has expressly consented.

48.     OFAC implemented Section 211 by adding a subpart (a)(2) to section 515.527 that tracked the language of Section 211 and provided that the general license no longer permits the registration and renewal of trademarks used in connection with a business or assets that were confiscated by foreign governments.  Title 31, section 515.527(a)(2) provides:

> No transaction or payment is authorized or approved pursuant to paragraph (a)(1) of this section with respect to a mark, trade name, or commercial name that is the same as or substantially similar to a mark, trade name, or commercial name that was used in connection with a business or assets that were confiscated, as that term is defined in § 515.336, unless the original owner of the mark, trade name, or commercial name or the bona fide successor-in-interest has expressly consented.

49.     Thus, with this change, a Cuban company claiming ownership of the registration

of a confiscated mark has to obtain a specific OFAC license authorizing the renewal of that

registration and payment of the statutorily mandated fee.

50.     In making such a licensing decision, OFAC determines: (a) whether the trademark

that is the subject of the proposed renewal application is the same or similar to one that was used

in connection with a business or assets confiscated, without compensation, by the Cuban

government, and (b) whether the renewal applicant has obtained the consent of the original

owner of the stolen mark or the latter's bona fide successor-in-interest to register or renew that

mark.

51.     By carving out from section 515.527, transactions and payments with respect to

previously confiscated marks "unless the original owner of the mark . . . or the bona fide

successor-in-interest expressly consented," Section 211 explicitly recognizes, and affords legal

protection to, the property interests of the original owner and bona fide successor-in-interest in

the confiscated mark.

52.     Section 211 also provides that U.S. courts shall not recognize or enforce any

rights in confiscated marks whether flowing from common law, statute or treaty:

> (a)(2)  No U.S. court shall recognize, enforce or otherwise validate
> any assertion of rights by a designated national based on common
> law rights or registration obtained under such section 515.527 of
> such a confiscated mark, trade name or commercial name.
>
> (b)  No U.S. Court shall recognize, enforce or otherwise validate
> any assertion of treaty rights by a designated national or its
> successor-in-interest under sections 44(b) or (e) of the Trademark
> Act of 1946 (15 U.S.C. 1126(b) or (e)) for a mark, trade name, or
> commercial name that is the same as or substantially similar to a
> mark, trade name, or commercial name that was used in connection
> with a business or assets that were confiscated unless the original
> owner of such mark, trade name, or commercial name, or the bona
> fide successor-in-interest has expressly consented.

53.     Section 211 therefore codifies the United States policy of non-recognition of

foreign confiscations as it relates to the enforcement of trademark rights, whether arising from the Lanham Act, a treaty, or common law.

## FACTUAL BACKGROUND

**A.      José Arechabala, S.A. Creates and Uses the HAVANA CLUB Trademark in 1934**

54.      The Arechabala family business was founded by Jose Arechabala Aldama in 1878 in Cuba.  The business included rum distilling and other enterprises.  JASA, which was incorporated in or around 1924, carried out the family's rum business.

55.      JASA began to use the trademark HAVANA CLUB for rum sold in commerce in the United States at least as early as 1934.  On May 14, 1935, JASA registered the words HAVANA CLUB on the Principal Register of the PTO as a trademark for, among other things, "rum" under U.S. Registration No. 324,385.  On June 16, 1936, JASA registered a label design including the words HAVANA CLUB on the Principal Register of the PTO as a trademark for, among other things, "rum" under U.S. Registration No. 335,919.

56.      From 1934 to the end of 1959, JASA continued to export HAVANA CLUB rum for distribution and sale in the United States.

**B.      The Cuban Revolutionary Government Confiscated JASA's Assets, Including the HAVANA CLUB Mark, in 1960**

57.      On January 1, 1960, armed forces from the Castro government forcibly entered into possession and confiscated the property and assets of JASA.  *Havana Club Holding, SA v. Galleon, S.A.*, 62 F. Supp. 2d 1085, 1090 (S.D.N.Y. 1999), *aff'd* 203 F. 3d 116 (2000).

58.      On October 15, 1960, Cuban Law No. 890 was issued, expropriating for the Cuban government the physical assets, property, accounts and business records of JASA.  *Id.*

59.      No compensation was ever paid to JASA or its owners by the Cuban government or any other entity on behalf of the Cuban government for the property and assets that were

seized in 1960. *Id.*

60.     On November 1, 1966, the Cuban government purported to transfer to Cubaexport the trade names and registered trademarks that had been confiscated from JASA, including the HAVANA CLUB mark and related registrations.

**C.     Cubaexport's Registration of the Confiscated HAVANA CLUB Mark**

61.     With all of its assets stolen by the Cuban government, and its executives and shareholders scattered across the globe, JASA had no ability to produce and sell its HAVANA CLUB branded rum (despite many efforts to do so) and ultimately its trademark registrations in the United States lapsed.

62.     On June 12, 1974, shortly after the registrations expired, Cubaexport applied to the PTO, under section 44 of the Lanham Act, 15 U.S.C. § 1126, to register the HAVANA CLUB trademark.

63.     On January 27, 1976, the PTO issued U.S. Reg. No. 1,031,651 of the HAVANA CLUB & DESIGN mark to Cubaexport.

**D.     Bacardi's Acquisition of the HAVANA CLUB Mark**

64.     In April 1997, through a series of transactions, JASA formally transferred to BACO all right, title, and interest in and to the HAVANA CLUB trademark worldwide and such other related assets.

65.     BACO is currently the applicant to register the trademark HAVANA CLUB for, among other things, rum under Serial Number 74/572667.  This application was filed by BACO's predecessor in interest Galleon, S.A. on September 12, 1994 after an agreement in principal had been reached with JASA.

66.     The PTO issued an Office Action advising, among other things, that BACO's application would be denied because of Cubaexport's existing registration of the same mark.

BACO's application is currently suspended pending resolution of a litigation in the United States District Court for the District of Columbia in which BACO seeks to rectify the register and/or cancel Cubaexport's registration on numerous grounds.

67.     Bacardi began selling HAVANA CLUB rum in the United States in 1995 and, but for periods of excusable non-use, it continues to sell HAVANA CLUB rum throughout the United States today.

**E.     Cubaexport's HAVANA CLUB Mark Registration Expired in 2006**

68.     Cubaexport's U.S. HAVANA CLUB Registration was set to lapse on July 27, 2006.

69.     On December 14, 2005, Cubaexport filed to renew its registration with the PTO and submitted a renewal fee from its counsel.  On or about April 6, 2006, OFAC informed Cubaexport's counsel and the PTO that the payment was not authorized.

70.     On April 7, 2006, Cubaexport's counsel wrote to OFAC to request a specific license to incur and receive payment for the expense of renewing the registration.

71.     On or about June 14, 2006, Cubaexport wrote to the PTO, urging the PTO to renew the registration despite the absence of a specific license from OFAC to pay the required fees.

72.     On July 20, 2006, the Post Registration Examiner issued an Office Action ("July 2006 Office Action") rejecting the renewal application because the "required fee for the combined fee has not been paid."

73.     The July 2006 Office Action gave Cubaexport six months to correct the deficiency in its renewal application by submitting the required fees or else "the registration will be deemed cancelled/expired":

> RESPONSE TIME DEADLINE:  A complete response must be received within 6 months from the mailing date of this Office action.  The owner must respond by notifying the USPTO whether the specific license application filed on April 7, 2006 has been granted or denied.  If the owner informs the USPTO that the specific license has been granted, the fee or authorization to charge the fee must accompany the response.  If the owner informs the USPTO that the specific license has been denied, or if OFAC notifies the USPTO that the specific license has been denied, the registration will be deemed cancelled/expired.

74.    On July 28, 2006, OFAC denied Cubaexport's April 7, 2006 request for a specific license to pay the registration renewal fee, explaining that it received guidance from the State Department that issuing the license would be "inconsistent with U.S. policy."

75.    Thus, on August 3, 2006, the Post Registration Examiner issued the Office Action ("August 2006 Office Action") finding that Cubaexport's renewal filing "cannot be accepted," and "the registration will be cancelled/expired."  *See* Exhibit 1.

76.    Cubaexport did not correct the deficiency in its December 2005 renewal application within the mandatory six-month period prescribed in the July 2006 Office Action.

77.    Thus, Cubaexport's HAVANA CLUB Registration expired on July 28, 2006, *see* 37 C.F.R. §§ 2.182-2.186.

78.    The PTO was obligated to perform its non-discretionary ministerial record-keeping function of updating the Principal Register by removing the dead Cubaexport HAVANA CLUB Registration from the Register.

79.    As a result of and in reliance on the PTO's August 2006 Office Action stating that "the registration will be cancelled/expired," Bacardi requested that its lawsuit against Cubaexport, pending in the United States District Court for the District of Columbia, seeking cancellation of the same registration be stayed.  Due to the events set out in this complaint, the lawsuit remained stayed for ten years.

**F.** **Cubaexport Sues OFAC and Petitions the Director of the PTO to Review the August 2006 Office Action**

80.     On October 4, 2006, Cubaexport petitioned the Director of the PTO to review the Post Registration Examiner's decision.  In its petition to the PTO Director, Cubaexport averred that the August 2006 Office Action should be reversed because it was not "correct" or otherwise amounted to "clear error or abuse of discretion."

81.     Cubaexport's petition to the Director did not and could not extend its time to correct the deficiency identified in the July 2006 Office Action, which deadlines are set by statute and regulation.

82.     Just a week before filing its petition to the Director, Cubaexport commenced an Administrative Procedure Act suit against OFAC, and used the pendency of that lawsuit in an effort to suspend a final decision by the PTO Director on its renewal application.  *See Empresa Cubana Exportadora de Alimentos y Productos Varios ("Cubaexport") v. U.S. Dep't of Treasury, et. al.*, Case No. 06-cv-1692 (D.D.C.) ("The OFAC Action").

83.     The Deputy Commissioner for Trademark Examination Policy of the PTO suspended action on the petition pending disposition of the OFAC Action.  The district court in the OFAC Action dismissed Cubaexport's claims on March 30, 2009.  On March 29, 2011, the United States Court of Appeals for the District of Columbia Circuit upheld the dismissal of Cubaexport's claims.  By May 2012, Cubaexport exhausted all appeals when the United States Supreme Court denied its petition for a writ of certiorari.  *Empresa Cubana Exportadora De Alimentos Y Productos Varios v. Dep't of Treasury*, 606 F. Supp.2d 59 (D.D.C. 2009), *aff'd* 638 F.3d 794 (D.C. Cir. 2011), *cert. denied* 132 S. Ct. 2377 (May 14, 2012).

84.     On June 8, 2012, having lost its action against OFAC, Cubaexport argued to the PTO that its HAVANA CLUB registration could not be cancelled by the PTO without a specific

license from OFAC.

85.     On July 11, 2012, Cubaexport wrote to OFAC advising that the PTO was

considering the status of the HAVANA CLUB registration, and reiterating Cubaexport's position

that the PTO could not take action without an OFAC license.  Cubaexport requested a meeting to

discuss the matter.

86.     On August 31, 2012, in preparation for that meeting, OFAC asked the PTO to

provide information regarding Cubaexport's registration, "including an explanation of any

applicable statutory requirements, rules and procedures."

87.     On September 27, 2012, the Commissioner for Trademarks provided OFAC with

a detailed memorandum of the PTO regarding these statutory rules and requirements that the

PTO was obligated to follow.

88.     In its September 2012 memorandum, the PTO wrote:

> Renewal requires "payment of the prescribed fee" for each class of
> goods and services and the timely "filing of a verified application:"
> signed by the registrant or the registrant's representative. . . .

> If the renewal application is not filed within the time periods set by
> statute, or if it is timely filed but unacceptable because it does not
> meet the statutory requirements, *see* 15 U.S.C. § 1059(a), the
> registration "expires" as of the end of its term.  37 C.F.R. §§ 2.182-
> 2.186.

> * * *

> The statutory requirements of maintenance and renewal, however,
> are distinct, as are the consequences of an untimely or
> unacceptable filing.  As noted above, if the requirements of §8 are
> not met, the Director is required by that provision to cancel the
> registration as of the end of its term.  If the requirements of §9 are
> not met, the registration expires as of the end of its term.

> * * *

> The Director has no discretion to waive the requirements of §§8
> and 9.  Thus, if a §8 affidavit, §9 renewal, or combined §8/9 filing

> is not accompanied by the prescribed fees, the Director has no
> discretion but to issue a refusal stating that the registration will be
> canceled and/or has expired.

*See* Exhibit 3.

89.     On November 30, 2012, OFAC stated that "no license is required under the

CACR for the PTO actions at issue."  It explained that if a renewal application "does not meet

the statutory requirements, the registration expires as of the end of its term."  The PTO's

"ministerial record-keeping function" of updating its records "does not alter the registration's

legal status," which "changes because the term of the registration ends without the owner

meeting the statutory requirements for renewal."

**G.      Between November 30, 2012 and January 13, 2016, the PTO Takes No Action on
         Cubaexport's Petition**

90.     Despite OFAC's confirmation in November 2012 that the CACR posed no barrier

to rectifying the Register, the PTO exceeded its statutory authority by failing to remove

Cubaexport's registration and failed to perform its non-discretionary duty to update its

registration records for an additional three years.

91.     Meanwhile, Bacardi's own application to register the HAVANA CLUB mark

remained, and still remains, suspended and will likely be refused because of Cubaexport's

registration.

**H.      OFAC and the PTO Improperly Attempt to Retroactively Revive Cubaexport's
         HAVANA CLUB registration**

92.     Upon information and belief, on or about November 10, 2015, Cubaexport

submitted another application to OFAC for a specific license in an effort to improperly revive its

long dead U.S. HAVANA CLUB registration.

93.     On January 11, 2016, more than nine years after the HAVANA CLUB

Registration had lapsed, OFAC issued a specific license to Cubaexport purporting to permit

Cubaexport "engage in all transactions necessary to renew and maintain the HAVANA CLUB trademark registration No. 1,031,651 at the United States patent and Trademark Office (PTO), including those related to Cubaexport's submission filed with the PTO on or about December 14, 2005, and the payment referenced therein, as described in the Application."

94.     Cubaexport sent the PTO a copy of the specific license on January 12, 2016.

95.     Just one day later, on January 13, 2016, the PTO granted Cubaexport's ten-year old petition and purported to accept Cubaexport's long-overdue filing fee and permit the renewal of Cubaexport's HAVANA CLUB registration.  *See* Exhibit 4.

96.     The Director instructed the Examining Attorney to renew its examination of Bacardi's application to register the HAVANA CLUB mark.  The existence of Cubaexport's registration prejudices Bacardi's application, which still remains suspended and will be refused under section 2(d) of the Trademark Act if Cubaexport's registration remains on the registry.

## CAUSES OF ACTION

### COUNT 1: Administrative Procedures Act

### (5 U.S.C. § 706(2), Action to Set Aside Agency Action that Is Unauthorized, Not in Accordance with Law, and/or Arbitrary and Capricious)

97.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

98.     Section 9 of the Lanham Act (15 U.S.C. § 1059) provides that at the conclusion of a trademark registration's ten-year term, it may be renewed "upon payment of the prescribed fee and the filing of a written application, in such form as may be prescribed by the Director."  The statute further provides that "[i]f any application filed under this section is deficient, the deficiency may be corrected within the time prescribed after notification of the deficiency, upon payment of a surcharge prescribed therefor."

99.   The term of Cubaexport's registration ended on July 27, 2006.  The examiner refused Cubaexport's application for renewal on July 21, 2006, because Cubaexport could not pay the statutorily required filing fee.  The notification prescribed a period of six months to correct the deficiency and stated that if Cubaexport could not pay the fee the registration "will be cancelled/expired."  Cubaexport then informed the PTO that OFAC would not provide a specific license enabling it to pay the statutorily required fee within the six months provided, and the examiner issued another action on August 2, 2006 maintaining its refusal of renewal.  Because Cubaexport's renewal application did not include "payment of the prescribed fee," and Cubaexport did not correct the deficiency "within the [six months] prescribed after notification of the deficiency," 15 U.S.C. § 1059, Cubaexport's registration expired.

100.   An applicant to renew a registration may petition the Director of the PTO to review the refusal of renewal.  37 C.F.R. § 2.186.  The Director reviews the actions of a post-registration examiner regarding a section 8 affidavit or section 9 renewal application to determine whether the judgment of the examiner was correct.  TMEP 1706.

101.   Here, the post-registration examiner was correct in rejecting the renewal application of Cubaexport because it did not and could not pay the filing fee as required by statute.

102.   Under the statute, the Director had no authority to do anything other than deny the petition and affirm the office action.

103.   Filing a petition with the Director does not toll or extend the time for a party to correct deficiencies in their renewal applications.  The statute requires deficiencies to be corrected "within the time prescribed after notification of the deficiency."  15 U.S.C. § 1059.  Regulations specify that this period will be six months, *see* 37 C.F.R. § 2.184, and Cubaexport

was in fact notified by the examiner that the deficiency had to be corrected within six months. That deadline is binding under the statute.

104.    The Director has no statutory authority to extend the time for paying a filing fee beyond the period prescribed in the notification of deficiency, much less to extend that time by ten years.  *See, e.g.*, *In re Culligan Int'l Co.*, 915 F.2d 680 (Fed. Cir. 1990) (applicant's failure to pay the late renewal fee under section 9 during the period allowed in the statute could not be waived by the Commissioner).

105.    Thus, the Director acted outside the scope of her statutory authority, and acted contrary to law, including 15 U.S.C. § 1059, when she granted Cubaexport's petition, permitted Cubaexport to pay its filing fee ten years late, granted renewal of the registration, and provided that PTO's records will be updated accordingly.

106.    That decision is also arbitrary and capricious and/or contrary to law because it is contrary to the PTO's own regulations.  Under the regulations, Cubaexport was required to respond to the Office Action to correct the deficiency within six months.  37 C.F.R. § 2.184(b); *see also* TMEP 1606.13 ("Any deficiency must be cured within the set period for response to the Office action, i.e., within six months of the issuance date of the action, or before the expiration date of the registration, whichever is later." (citing 37 C.F.R. § 2.184(b)).

107.    The PTO's action is also arbitrary and capricious because the agency changed its position without acknowledging, much less offering a reasoned explanation for, the change.  In September 2012, the Commissioner for Trademarks provided OFAC with a memorandum of the PTO setting forth the PTO's interpretation of the law and stating that the PTO has no discretion to excuse Cubaexport's failure to pay its filing fee or to do anything other than to reflect on the register that Cubaexport's registration has expired.  *See* Exhibit 3.  In 2016, however, in a brief

decision, the Commissioner for Trademarks (acting under delegated authority from the Director) purported to reach a contrary conclusion. *See* Exhibit 4. In doing so, however, the Commissioner did not even address that this was a change in the agency's position from 2012. The Commissioner therefore did not provide any reasoned explanation for this change of position.

108.    Thus, the PTO's action is unauthorized and not in accordance with law, and arbitrary and capricious.

## COUNT 2: Ultra Vires Action

109.    As explained above, the Director had no authority to do anything other than deny Cubaexport's petition and affirm the office action holding that Cubaexport had failed to pay the renewal fee and, therefore, its registration was expired.

110.    The PTO itself agrees that "[t]he Director has no discretion to waive the requirements of §§8 and 9. Thus, if a §8 affidavit, §9 renewal, or combined §8/9 filing is not accompanied by the prescribed fees, the Director has no discretion but to issue a refusal stating that the registration will be canceled and/or has expired." Exhibit 3.

111.    Thus, the PTO acted in violation of the Trademark Act in allowing renewal of Cubaexport's registration. Such *ultra vires* acts are unauthorized and violate the statute.

112.    The Court should reverse the Director's ruling and direct the PTO to remove Cubaexport's registration from the registry.

## PRAYER FOR RELIEF

113.     Bacardi therefore asks that the Court: (i) set aside the decision of the Director of

the PTO; (ii) declare that Cubaexport's HAVANA CLUB trademark registration (U.S. Reg. No.

1,031,651) expired as of the end of its term in 2006; and (iii) order the PTO to remove

Cubaexport's expired HAVANA CLUB trademark registration from the registry.


Dated:    Washington, D.C.                      Respectfully submitted,
          December 28, 2021


                                                 */s/ Cameron R. Argetsinger*
                                                Cameron R. Argetsinger (Bar No. 72703)
                                                KELLEY DRYE & WARREN LLP
                                                Washington Harbour
                                                3050 K Street NW, Suite 400
                                                Washington, DC 20007
                                                (202) 342-8649

                                                Michael C. Lynch (*pro hac* application forthcoming)
                                                Damon Suden (*pro hac* application forthcoming)
                                                KELLEY DRYE & WARREN LLP
                                                3 World Trade Center
                                                175 Greenwich Street
                                                New York, New York 10007
                                                (212) 808-7500

                                                David Zionts (*pro hac* application forthcoming)
                                                COVINGTON & BURLING LLP
                                                One CityCenter
                                                850 Tenth Street, NW
                                                Washington, DC  20001-4956
                                                (212) 662-5987

                                                Attorneys for Plaintiffs